**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| OSAMA IBRAHIM, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-4329 |
| | § | |
| CITY OF HOUSTON, TEXAS and | § | |
| STEPHEN L. WILLIAMS, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this employment discrimination suit, Osama Ibrahim sues his former employer, the City of Houston, Texas, and Stephen L. Williams, Director of the City of Houston Department of Health and Human Services ("HDHHS"). Ibrahim alleges that his employment was terminated because of discrimination based on his national origin, religion, and race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and 42 U.S.C. § 1983. Ibrahim also alleges a violation of 42 U.S.C. § 1981. (Docket Entry No. 1). Ibrahim asserts that during his employment, the Assistant Director of HDHHS, Dr. Raouf Arafat, "repeatedly told [him] that Williams did not want [him] in the Department because of [his] religion and national origin." (Docket Entry No. 31, Ex. 1, Declaration of Osama Ibrahim at ¶ 9).

The defendants have moved for summary judgment. (Docket Entry No. 30). The defendants assert that the competent summary judgment evidence shows that Ibrahim was terminated for substandard performance. The defendants argue that the evidence as to Williams's statement is inadmissible hearsay and that, even if the evidence is admissible, the record shows that the same decision would have been made regardless of any discriminatory animus. (*Id*.). Ibrahim has

responded, (Docket Entry No. 31),  the defendants replied, (Docket Entry No. 32), and Ibrahim filed

a surreply, (Docket Entry No. 35).

Based on a careful review of the pleadings, the motion, response, and replies, the record, and

the applicable law, this court denies the defendants' motion for summary judgment.  The reasons

are explained in detail below.

## I.       Background

### A.       The Summary Judgment Record

The summary judgment evidence in the record includes the City of Houston's Job Posting

for the Bureau Chief of Epidemiology position, (Docket Entry No. 30, Ex. 2); Ibrahim's curriculum

vitae, (*id.*, Ex. 3); Ibrahim's City of Houston Personnel Requisition Form, (*id.*, Ex. 4); Ibrahim's

June 2005 Employee Performance Evaluation ("EPE") Plan, (*id.*, Ex. 5); January 2006 e-mail

correspondence between Ibrahim and Arafat, (*id.*, Ex. 15); February 19, 2006 e-mail correspondence

between Ibrahim and Arafat, (*id.*, Ex. 11); letters from Ibrahim's subordinates to Arafat and

Williams, (*id.*, Exs. 12, 13, 14); Arafat's affidavit, (*id.*, Ex. 17); Williams's affidavit, (*id.*, Ex. 19);

excerpts of Ibrahim's deposition, (*id.*, Ex. 21; Docket Entry No. 31, Ex. 3); excerpts of Arafat's

deposition, (Docket Entry No. 31, Ex. 2); Ibrahim's affidavit, (*id.*, Ex. 1); Ibrahim's April 2006

evaluation, (Docket Entry No. 30, Ex. 6); Arafat's letter to Williams recommending Ibrahim's

termination, (*id.*, Ex. 7); Williams's termination letter to Ibrahim, (*id.*, Ex. 8); and Ibrahim's

resignation letter, (*id.*, Ex. 9).

The record also contains translated transcripts of several tape-recorded Arabic conversations

between Ibrahim and Arafat.  There are two English versions of their January 7, 2006 and May 31,

2006 conversations: one translated by Ibrahim, (Docket Entry No. 31, Exs. 1A, 1B), and the other

translated by Nina Midway, a licensed court interpreter, (Docket Entry No. 32, Ex. 23).  The defendants argue that Ibrahim's references to the recorded conversations and transcripts "are not properly before this court as competent summary judgment evidence as they have not been properly authenticated."  (Docket Entry No. 32, at 8).  The defendants assert that they reached an agreement with Ibrahim to have a licensed court interpreter translate the tape recordings, and that Midway's transcript is the result of that agreement.  According to the defendants, Ibrahim's translation of the recordings "merely bolsters his claims."  (*Id.*, at 9).

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  *See also In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (citing rule).  "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001) (internal citation and quotation marks omitted).  The requirement under Rule 901 is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."  *Id.* (quotation omitted); *see also United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993) ("[T]his court does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.").

Ibrahim has submitted sufficient evidence of authenticity to meet the Rule 901 standard.  He stated in his affidavit that "[t]he true and correct English translations of these Arabic conversations

3

– up to my best language and translation skills – are attached to my declaration." (Docket Entry 31, Ex. 1, Declaration of Osama Ibrahim).  The affidavit includes Ibrahim's sworn statement "under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and based on my personal knowledge."  (*Id.*).  The relevant excerpts of his conversations with Arafat are included in the affidavit.  (*Id.*).  And the authenticity of Ibrahim's transcripts of the tape-recordings is supported by the fact that most of their contents are similar to, or corroborated by, Midway's transcripts.  There is sufficient evidence to conclude that the transcripts Ibrahim submitted are translations of the January 7, 2006 and May 31, 2006 conversations that he tape-recorded.

The defendants argue that Ibrahim's translations are incorrect and therefore incompetent summary judgment evidence.  The defendants' contentions as to accuracy go to the weight to be given his translations but do not make them inadmissible.  In *United States v. Morales-Madera*, 352 F.3d 1 (1st Cir. 2003), the court explained how a district court should approach conflicting translations of evidence that is not in English:

> [I]t is advisable for the district court to try to obtain a stipulated transcript from the parties before trial or, at least, before a transcript is used.  Failing such stipulation, each party should be allowed to introduce its own transcript of the recording provided that it is properly authenticated. When the jury receives two transcripts of the same recording, it should, of course, be instructed that there is a difference of opinion as to the accuracy of the transcripts and that it is up to them to decide which, if any, version to accept.  The jurors should also be instructed that they can disregard any portion of the transcript (or transcripts) which they think differs from what they hear on the tape recording.
> . . . .
>
> In the case of tapes of non-English conversations, however, there is the additional problem of potential translation error.  If the parties do not agree that the English transcript submitted is correctly translated,

> the preferred solution is to obtain agreement from counsel as to an
> accurate translation.  If agreement is not possible, the district
> court should have the parties present testimony from translators and allow
> the jury to decide the issue.

*Id.* at 8 (citing WEINSTEIN & BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 901.09); *see also United States v. Thompson*, 130 F.3d 676, 682–83 (5th Cir. 1997) (finding no abuse of discretion where trial court admitted disputed transcript even though it contained potential inaccuracies).[1]  Applying this approach, the defendants' objection to Ibrahim's translations of the tape-recorded conversations is overruled.  The translations are competent summary judgment evidence.

### B.    The Evidence in the Record

Osama Ibrahim began working as Bureau Chief of the Bureau of Epidemiology for the HDHHS, a department within the City of Houston, on April 18, 2005.  (Docket Entry No. 30, Ex. 4).  Ibrahim is an Arab, a Muslim, and of Egyptian origin.  (Docket Entry No. 1, at 4).  Arafat had recruited Ibrahim for the Bureau Chief position in March 2005.  (Docket Entry No. 30, Ex. 17, Affidavit of Raouf Arafat).  Like Ibrahim, Arafat is Arab, Muslim, and was born in Egypt.  (*Id.*).  The two men met while Arafat was serving as president of the Egyptian-American Society, Houston Chapter.  Arafat learned that Ibrahim was seeking a job in the United States and encouraged him to

---

[1]  When tape recordings are in English, it is common to assist the jury in understanding them by providing "aids" in the form of transcripts.  The court instructs the jury that the tape, not the transcript, is "the evidence," that it should resolve any inconsistencies between the tape and the transcript in the tape's favor, and that it should not use the transcript except when listening to the tape.  *See Thompson*, 130 F.3d at 682–83. "Where the tapes are in a language other than English, however, such instructions have an air of the unreal, not to say the surreal."  *In re Audibility of Certain Recorded Conversations*, 691 F.Supp. 588, 592 (D. Conn. 1988); *see also United States v. Rrapi*, 175 F.3d 742 (9th Cir. 1999) (instruction that the tape is the evidence and transcript is merely an aid is nonsensical where the conversation on the tape is not in English). "Transcripts in a language other than English will almost invariably be useless to the jury; the jury will need translations. And a jury cannot very well follow the tapes where they conflict with translations if the jury does not understand the language of tapes. In such circumstances, it may make more sense to treat translations of transcripts of non-English-language conversations, as well as the tapes, as 'evidence.'"  *In Re Audibility of Certain Recorded Conversations*, 691 F.Supp. at 592.

apply for the Bureau Chief position.  (*Id.*).

The selection panel for the Bureau Chief position was made up of Arafat and two other HDHHS Assistant Directors.  The Bureau Chief position required a Master's Degree in Public Health or a closely related field and "[f]our years of supervisory and administrative experience in a major health agency."  (Docket Entry No. 30, Ex. 2).  The core functions of the Bureau Chief of Epidemiology position include: supervising bureau staff; directing, coordinating, and evaluating epidemiologic surveillance and outbreak investigation activities; coordinating the collection of epidemiological data to analyze disease trends; guiding the development of quality assurance and quality control programs; and designing, developing, and recommending new public health programs and strategies to handle expanded community growth.  (*Id.*).  In March 2005, the HDHHS also stressed a strong technical background because "technological services in the Bureau were lacking and not as efficient as they needed to be."  (Docket Entry No. 30, Ex. 19, Affidavit of Stephen Williams).

Ibrahim applied and went through the selection process.  The panel found him the most qualified applicant.  Ibrahim has a masters degree in public health practice and public health management and a Ph.D. in the epidemiology of infectious disease.  He had worked as a senior epidemiologist and project coordinator at the Centers for Disease Control ("CDC") in Atlanta, Georgia and as a public health consultant at the Ministry of Health in the United Arab Emirates.  He also had experience developing surveillance systems for infectious diseases, an important part of the Bureau Chief's responsibilities.  The selection panel recommended that the Department hire Ibrahim as Bureau Chief of Epidemiology at HDHHS.

Arafat met with Stephen Williams, Director of HDHHS, to recommend Ibrahim and present

his curriculum vitae and application for Williams's review.  Williams was Arafat's supervisor.
Williams is neither Arab nor Muslim, but African-American.  Williams agreed that Ibrahim was a
good candidate.  He stated in his affidavit that Arafat was "very excited about Dr. Ibrahim's
credentials because he had a technical background."  (Docket Entry No. 30, Ex. 19, Affidavit of
Stephen Williams).  He testified that he "vaguely remember[s] Dr. Arafat mentioning [during this
meeting] that Dr. Ibrahim was one of his fellow countrymen."  (*Id.*).  Williams "allowed [Arafat]
to make the decision to hire Dr. Ibrahim since he would be reporting directly to [Arafat]."  (Docket
Entry No. 30, Ex. 17, Affidavit of Raouf Arafat).  The Personnel Requisition Form for Ibrahim
stated that Arafat was the decisionmaker for Ibrahim's hiring.  (Docket Entry No. 30, Ex. 4).  Arafat
signed the form on March 21, 2005.  (*Id.*).  The defendants maintain that although Arafat was the
one who offered Ibrahim the job, "Williams served as the reviewing authority for Ibrahim's hire."
(Docket Entry No. 30, at 15).  Williams signed the requisition form to hire Ibrahim, as the reviewing
authority, on March 29, 2005.  (Docket Entry No. 30, Ex. 4).

Arafat testified in his deposition that he gives all new employees an EPE Plan outlining their
responsibilities and the City's expectations.  An EPE Plan sets out factors rating an employee's
performance.  The rating scale is from 1– unacceptable to 5– outstanding.  The weight of each factor
is listed on the plan.  Arafat does a yearly evaluation to rate the employee's performance based on
the plan factors.  (Docket Entry No. 31, Ex. 2, Arafat Deposition at 60:13–23).  In between the plan
and the evaluation, Arafat meets one-on-one with each employee every two weeks to offer feedback
on performance.  (*Id.*).

In June 2005, Arafat gave Ibrahim an EPE Plan that outlined the responsibilities and
expectations of Ibrahim as Bureau Chief of Epidemiology.  (Docket Entry No. 30, Ex. 5).  Ibrahim's

main responsibility as Bureau Chief was to supervise the Bureau's staff in directing, coordinating, and evaluating epidemiological surveillance and outbreak investigation activities.  Ibrahim had three Epidemiologist Managers working under him – Mark Perry, Marcia Wolverton, and Adebowale Awosika-Olumo ("Debo") – as well as multiple epidemiologists and staff members.   Among Ibrahim's specific responsibilities listed in his EPE Plan were: supervising and developing the Public Health Information Network System ("PHIN") and National Electronic Disease Surveillance System ("NEDSS") for the HDHHS; coordinating the collection of epidemiology data to analyze for disease trends; and ensuring timely and accurate reporting of reportable diseases and conditions to the appropriate entities.  (*Id.*).

The defendants assert that from the beginning of his employment, Ibrahim had problems accomplishing his duties and working with staff.  Ibrahim reported directly to Arafat and had minimal contact with Williams.  (Docket Entry No. 30, Ex. 19, Affidavit of Stephen Williams).  In his affidavit, Williams stated that although he had little contact with Ibrahim, he "did become aware of [Ibrahim's] lacking performance through discussions with Dr. Arafat and other employees on Dr. Ibrahim's staff.  They all had concerns with Dr. Ibrahim's lack of productivity and his failure to communicate effectively with his staff."  (*Id.*).  Williams stated that he did not take action at first because Ibrahim had just started and Williams wanted to give him time to adjust to his new position. (*Id.*).

Ibrahim disputes problems with his productivity or communication skills.  He asserts that during his employment, Arafat "repeatedly told [him] that Williams did not want [him] in the Department because of [his] religion and national origin."  (Docket Entry No. 30, Ex. 1, Declaration of Osama Ibrahim at ¶ 9).  In Ibrahim's transcript of his January 7, 2006 conversation with Arafat,

the two men discussed Williams and the "negative environment" in the workplace.  (Docket Entry

No. 31, Ex. 1A).  Arafat stated:

> All what we can do is continue working professionally and wait and
> see, maybe God is testing us, maybe we had done something bad and
> he is sending these people to punish us.  At the time of the previous
> director there has been people who were suffering and afraid that she
> with [sic] let them go and at the end they have stayed and she is gone.
> I do not know, maybe we deserve that these things happen to us and
> this is why God had sent him against us.  But, this man is a racist
> although; he doesn't say it, but, he is a racist, period.

(*Id.*).  The same statement in Midway's transcript is: "We should do our best, Osama, we should as

much as we can, people suffer, but God is generous, Our God, we will not know, but God has the

power, there are a lot of people who suffer [. . . ]."[2]  (Docket Entry No. 32, Ex. 23).  Ibrahim then

asked Arafat what Williams meant when he said "I am a bald bearded black."  (Docket Entry No.

31, Ex. 1A).  Ibrahim's transcript reflects the following exchange:

| | |
|---|---|
| Arafat: | [H]e wants to tell you that he is not good looking guy and people know it and they still like him. |
| Ibrahim: | [B]ut Debo told me that this means that he belongs to the black panthers. |
| Arafat: | [P]ossible, but understand it the other way. |
| Ibrahim: | [T]hese are the black activists. |
| Arafat: | [P]ossible but what does this means. |
| Ibrahim: | [I]t means that he believes in human rights and minorities rights. |
| Arafat: | I do not care, maybe.  I take it that he is a bald man who doesn't care. |
| Ibrahim: | Debo told me another thing that the head cover that he was wearing; he told me that this looks like that of this group. |

---

2    In Midway's transcript, the symbol "[. . .]" means "inaudible."

9

| | |
|---|---|
| Arafat: | Ok, but what does this means. |
| Ibrahim: | [T]hese people, I think, were part of the American civil rights movement. |
| Arafat: | Ok, this means they against Muslims. |
| Ibrahim: | No, the black panthers were allied of Malcolm X and he was a muslim. |
| Arafat: | Listen buddy, this man hates Muslims.  Listen to what I am telling you because I have been engaged with him in a discussion about that, but after it, I never repeat it again.  [H]e hates Muslims, he hates Islam not Muslims, and he believes that Islam is a bunch of hocus pocus, done.  Osama, I swear to God, when I brought you, the first thing he told me after I hired you, I swear to God. He told me; do you know what people will say and I told him; they will say white American and he said; no, you know what they will say Muslim. He is Muslim like you, Muslim brought Muslim, done. |

(*Id.*).  Midway's transcript reported the same exchange as follows:

| | |
|---|---|
| Arafat: | He wanted to tell you he is so ugly, and people do not like him, he is an activist. |
| Ibrahim: | What does that mean? |
| Ibrahim: | That does not mean anything. |
| Arafat: | The minorities. . |
| Ibrahim: | I understand. . . |
| Arafat: | Maybe I don't care, I thought he is he is a bold man, maybe he is, what does that mean? [Noise] |
| Ibrahim: | Deebo was telling me about the hat, they formed a revolution of the black center, and they are activists against the Muslims, this man hates the Muslims, he hates Islam, not the Muslims, Islam not the Muslims, he said Islam is all non sense [sic]. |
| Arafat: | Osama, I swear to God, as soon as I brought you, he said Muslim Egyptian, Do you know what people will say, I said to him so [ . . .]. |

10

(Docket Entry No. 32, Ex. 23).

Arafat continued, telling Ibrahim about Dr. Aziz, whom Arafat wanted to hire sometime in

2004.  Ibrahim's transcript shows the following exchange:

> Arafat:  [W]hen I was going to hire Dr. Azeez from the CDC and he read his name, he shouted at me and he told me; no, I do not want him, then I told him; why? He is an excellent guy let me get him.  Then he told me; no, I do not want him, he is a Muslim.  Then, I told him, how did you know? Then, He told me; his name.  Then I told him; his name is very common among Hispanics and you are in America and you should know this, any way, he is not Muslim and this name is not a Muslim name and the name Azeez is very common among Hispanics, moreover the man's other name is Arturo or something like that and I told him, again, his name has no relation to Islam and he is not and Muslim.  Then he told me; are you sure? because "I was taken off completely when I read his name."  [T]his happened about a year or more before your arrival.  At this time it seems that he did not know that I am a Muslim because he brought me a bottle of liquor when he came to visit me at my home.

> Ibrahim:  [A]re you kidding[?]

> Arafat:  No.

> Ibrahim:  Where is it.

> Arafat:  [I]t is still at home.

> Ibrahim:  [Laughs].

> Arafat:  [Laughs].  [T]hey do not even know who we are.  [T]his is the second one that I have received.

> Ibrahim:  [W]ho brought you the first one?

> Arafat:  [A]nother one like him.  [A]t these days, he used to show me his hatred against Muslims freely thinking that I will be happy as he was under the impression that I am not a Muslim. But, if he really could not know that I am a Muslim, he is a real foolish man.

> Ibrahim:  But, what Arafat could be?

Arafat:      Osama, he does not have cultural knowledge.  [T]his man doesn't know anything in life other than, Georgia and Houston.  When you talk to him, he knows nothing.  This man is completely cultural ignorant. I have met other African Americans who are highly cultured, look at Dr. Galloway's husband, a highly educated and fine cultured man. This guy had never seen or known anything outside the US. Ask him he will tell you I have never left outside of the States, even to Mexico or Canada.

(Docket Entry No. 31, Ex. 1A).  Midway's transcript reported the same exchange as follows:

Arafat:      When the doctor Aziz read his name, he said, I do not want him, he is Muslim, he said, he is a Muslim I do not want him.  You are in America; Aziz is a regular name [. . .]. One guy named Arturo, he questioned the name, he asked what the origin of the name is, and he said to me: are you sure, I will take him off completely when I read his name.

Ibrahim:     [Laughs].

Arafat:      I don't know, should I do that for over a year and maybe one year and one month?

Ibrahim:     [Laughs].  Is it the truth[?]

Arafat:      He does not know that I am a Muslim.  Are you sure?

Ibrahim:     [Laughs].

Arafat:      They don't know who and what we are.  I swear to God, once he was walking, I will tell you, we don't know who we are, those days I hide, so he does not find out.  He does not know but Houston and Georgia, he does not know anything. When someone talks to him, he does not know anything.  He is very educated, with a fine education, I don't know.  He never left America, not to Mexico or Mexico. He told me that.

(Docket Entry No. 32, Ex. 23).  Ibrahim asserts that Arafat's statements in the January 7, 2006 conversation relating what Williams had said reveal his discriminatory animus toward Muslims and Middle Easterners.  The defendants assert that Midway's translation of the tapes shows that "there are no conversations between [Ibrahim] and Arafat that specifically implicate Stephen Williams

12

engaging in discriminatory conduct." (Docket Entry No. 32, at 9). Ibrahim asserts that any differences in translation occurred because Midway translated the words "literally" without knowing the context of the conversations and because "there were portions of the tape that were inaudible to her." (Docket Entry No. 35, at 4 n.5).

Williams denied stating that he wanted to get rid of Ibrahim because he is Muslim and Middle Eastern. (Docket Entry No. 30, Ex. 19, Affidavit of Stephen Williams). In his deposition, Arafat denied telling Ibrahim that Williams hates Muslims, hates Islam, and believes Islam is a bunch of "hocus-pocus." (Docket Entry No. 31, Ex. 2, Arafat Deposition at 36:21–24). Arafat did not recall saying anything to Ibrahim like "Williams is racist" but acknowledged that it was possible. The following exchange occurred in Arafat's deposition:

> Q.   Is it possible that you would have called Stephen Williams a racist?
>
> A.   I don't think so, but I – you know, we – typically because we socialized, we talked about everything, everything, joking, jokingly, and making comments on everybody, as Dr. Ibrahim made lots of comments about people and I was listening and talking to him. It's just a very – it's society talk, it doesn't mean anything.
>
> . . . .
>
> Q.   If you made this statement to Dr. Ibrahim that Stephen Williams is a racist, in your opinion, it doesn't mean anything.
>
> A.   Yes, it doesn't mean anything. If I made the statement. I don't remember making the statement. That doesn't mean anything.

(*Id.*, at 35:24–36:20). Arafat was asked if he remembered Williams saying something like "people would say a Muslim hired a Muslim." Arafat responded that he remembered "something like this, but it doesn't – again, it doesn't really – Stephen jokes about things a lot. And, actually, he knew that I was recruiting Dr. Ibrahim before I even asked him to apply for the position." (*Id.*, at 37:9–13). Arafat testified that Williams was joking when he said that people would say a Muslim

hired a Muslim because "he's not a racist by any means."  (*Id.*, at 37:23–38:2).  Arafat did not recall

an individual named Dr. Aziz and denied that Williams ever made a statement about not wanting

to hire a Dr. Aziz because of his last name.  (*Id.*, at 38:4–19).  Arafat testified that Williams knew

he was a Muslim when Williams came to the HDHHS in 2004.  Arafat admitted telling Ibrahim that

Williams had brought a bottle of liquor to his house.  But Arafat did not recall telling Ibrahim that

Williams did not know he was a Muslim because of the fact that he brought liquor to his house.  (*Id.*,

at 40:1–17).  According to Arafat, Williams "knows that I'm Muslim."  (*Id.*).

On January 12, 2006, Jeffrey Meyer, an epidemiologist in Ibrahim's Bureau, e-mailed the

"HIV Pending Summary Report 1/12/06" to Ibrahim and Arafat, among others.  (Docket Entry No.

30, Ex. 15).  Meyer stated that "[t]here are currently 321 new investigations (I+S)s and 16 written

cases (Ws) waiting for review (Ws) on pending . . . .  There was a large number, 120, new (I+S)s

added to pending this week."  (*Id.*).  Arafat responded to Ibrahim, stating: "Is this acceptable to you?

Can we get some more accountability in this program?  How many times do I have to comment on

the same thing to make it right?"  (*Id.*).

Ibrahim asserts that beginning in January or February 2006, Arafat stopped talking with him

regularly, stopped being his friend, and generally treated him differently.  According to Ibrahim,

Arafat "turned sharply against [him] and started to attack [him] and [his] performance publicly."

(Docket Entry No. 31, Ex. 1, Declaration of Osama Ibrahim).  Ibrahim asserts that Arafat's change

in behavior resulted from Williams's instruction that Arafat had to fire Ibrahim.  As evidence,

Ibrahim points to Arafat's statements in their May 31, 2006 conversation that Arafat had been "on

fire" for three or four months because he did not want to terminate Ibrahim's employment but had

been ordered to do so.

On February 19, 2006, Ibrahim e-mailed Arafat a report titled "Epi in Review." (Docket Entry No. 30, Ex. 11). Ibrahim stated in the e-mail that everyone in his bureau had worked hard to complete the report by that date and that several individuals had volunteered to work beyond their regularly scheduled hours to do so. (*Id.*). He explained that "[o]ur concern and reason for the extended hours was to assure a quality product" by the deadline. (*Id.*). Arafat responded, stating that he was bothered that "you have to go to volunteers to complete the task while data analysis and report writing is at least 25% of every Epidemiologists's job description." (*Id.*). He noted that the project had been assigned in June 2005 as part of the EPE Plan for Ibrahim and the bureau's staff. (*Id.*). Arafat recounted how he had complained about the first draft he received in December 2005 and had requested a new draft because the "[d]ata analysis was very simplistic, writing was weak [,] and presentation was terrible." (*Id.*). Arafat complained that Ibrahim had moved the deadline by two-week intervals from December 2005 until "this morning when I received it." (*Id.*). Arafat explained that he did not know "why all the delay and the broken deadlines" and that he had "received no explanation as to why staff were confused and upset with the task." (*Id.*). Arafat further stated that he did not "see this task as heroic as you think . . . [and that] not meeting deadline[s] is mismanagement of the task, lack of good planning or miscommunication with staff [,] or all of these together." (*Id.*).

In April 2006, two of the Bureau's Managers complained about Ibrahim to Arafat and Williams. On April 10, 2006, Perry wrote Arafat to inform him of his "worsening relationship with the Bureau of Epidemiology." (Docket Entry No. 30, Ex. 12). Perry stated that the relationship had "become strained" because he was "unable to communicate effectively with the Bureau Chief, Dr. Ibrahim. In general, Dr. Ibrahim appears to be unwilling to work with me, and when he does give

the appearance of working with me, it is in the most passive manner, and almost invariably with what I feel to be personal animosity and negativity towards me." (*Id.*). Perry offered examples of his problematic encounters with Ibrahim. Perry stated that "[t]o the casual observer, these may individually appear to be examples of simple 'miscommunications," but that "in their sum total, they represent a pattern of obstinate, even personalized passive-aggressiveness towards me, which I feel threatens to keep me from doing the most effective job, possible." (*Id.*). On April 14, 2006, Wolverton e-mailed Arafat to complain that she had just left a meeting with Ibrahim "where we were not in agreement as to the process for EPEs." (Docket Entry No. 30, Ex. 13). Wolverton had "worked diligently (and long hours) . . . to meet the deadline set by Dr. Ibrahim" for completing EPEs for employees Jerry Harms, Jeffrey Meyer, and Lupita Thornton. Wolverton rated them as 3.83, 3.84, and 4.16, respectively. As Bureau Chief, Ibrahim had to sign off on these EPEs before submitting them to the Division. Ibrahim did not agree with these ratings, told Wolverton that "Jerry and Jeff should score at least as high as Lupita," and asked Wolverton to change the scores accordingly. Wolverton responded that she could give Ibrahim a breakdown of the scores to explain why she evaluated them as she did, but Ibrahim "did not allow [her] to complete [her] discussion" and told her that they "would discuss this when he returned" from an out of town trip the following week. (*Id.*). The deadline for submitting EPEs would pass in the interim. Wolverton told Arafat that she was frustrated with Ibrahim's "behavior," that she could not "continue to work in a crisis mode," and that she was not the only one who felt that way. Wolverton explained that this and other encounters with Ibrahim were so frustrating that she was contemplating early retirement. (*Id.*).

The record contains Arafat's April 24, 2006 annual review of Ibrahim's performance based on the expectations and duties in Ibrahim's June 2005 EPE Plan. (Docket Entry No. 30, Ex. 6).

Arafat gave Ibrahim a rating of 2.68 out of 5.00, which was in the "Needs Improvement" category. (*Id.*).  Under the heading "Communication," Arafat wrote that "Ibrahim failed to appropriately communicate with his staff on many occasions," and that despite frequent counseling by his supervisor, "there has been no improvement during the evaluation period." (*Id.*).  Under the heading "Productivity," Arafat wrote that "Ibrahim did not demonstrate ability to complete assigned projects in an acceptable time frame during the evaluation period." (*Id.*).  Arafat pointed to the NEDSS and PHIN projects as examples of Ibrahim's "failure to produce work meeting quality standards." (*Id.*). Arafat stated that to improve, Ibrahim "must do more than talk about his projects, and must regularly demonstrate proof of progress on goals." (*Id.*). Arafat and Williams signed the evaluation on April 27, 2006.  (*Id.*).  The form indicates that Ibrahim "Refused to Sign."  (*Id.*).

Ibrahim asserts that he was never asked to sign the evaluation and that the first time he saw it was when it was produced in this lawsuit.  Ibrahim alleges that the evaluation was fabricated by Williams and Arafat to cover up the discriminatory termination.  (Docket Entry No. 31, Ex. 1, Declaration of Osama Ibrahim).  Ibrahim points out that although there is a signature line for the Human Resources Department, that line is blank.  He asserts that, under the City's policies, "[a]ll finalized EPEs [m]ust be sent to the HR for documentation and to be kept in the employee file at HR." (*Id.*).  According to Ibrahim, there is no indication that this evaluation was ever sent to or filed with Human Resources.  Ibrahim asserts that Arafat also failed to follow the City's policies by not following up on Ibrahim's purported refusal to sign the EPE by sending a memo confirming the employee's refusal and explaining his grievance rights.  (*Id.*).  Ibrahim asserts that further evidence of fabrication is seen in his April 26 and 27, 2006 tape-recorded conversations with Arafat.  Ibrahim did not submit a transcript of these recordings but included excerpts in his affidavit.  Ibrahim asserts

that Arafat sent him an e-mail on April 23, 2006 with a blank EPE form attached, asking Ibrahim to evaluate himself, fill out the form, and send it back.  According to Ibrahim, he reminded Arafat in their April 26 recorded conversation that he had sent Arafat the suggestions for his EPE evaluation and Arafat responded, "I know, ok, ok." (*Id.*).  Ibrahim asserts that on April 27, he again asked Arafat about his evaluation and Arafat responded "I do not have to do one for you" because EPEs are not required for executive-level employees, such as Bureau Chiefs. (*Id.*).  Arafat continued "Anyway, whether I do one for you or I do not, it is the same." (*Id.*).  In his deposition, Arafat testified that an EPE is not required for executive-level employees, but that he "prefer[s] to do it" and conducts EPEs with all Bureau Chiefs "once a year." (Docket Entry No. 31, Ex. 2, Arafat Deposition at 60:4–18).  Ibrahim asserts that the defendants cannot rely on this evaluation as a legitimate basis for terminating his employment.

The record also contains a letter from Arafat to Williams, dated April 26, 2005,[3] in which Arafat recommended to Williams that Ibrahim's employment be terminated immediately. (Docket Entry No. 30, Ex. 7).  This letter was written two days after the date on Ibrahim's evaluation form and one day before the date Arafat and Williams signed the form.  In the letter, Arafat told Williams that although Ibrahim was hired "because of his experience in developing surveillance systems," he "failed during this year of employment to actively improve even existing surveillance activities, and allowed a major surveillance database to remain without service or support until it completely failed." (*Id.*).  Arafat also stated that Ibrahim had "failed to use [his] training to develop the staff available to him" and the bureau's managers have complained that he "has isolated himself even

---

[3]  The 2005 date is a typographical error because Ibrahim had barely begun work in April 2005.  The chronology of the events described in the record shows that the date should have been April 26, 2006.

among his own staff, and has developed an environment of nepotism and cronyism that is absolutely contrary to . . . the policies of this Department and the City." (*Id.*).  Arafat explained that he gave Ibrahim one year to learn what was expected of him and to demonstrate his "willingness and ability to meet them." (*Id.*). After "repeated counseling for his inadequacies," Ibrahim's performance had not improved and had actually worsened.  (*Id.*).  Arafat told Williams that he no longer had confidence that Ibrahim could effectively perform his job duties and that his employment should be terminated. (*Id.*).

Ibrahim asserts that the April 26 termination recommendation letter was fabricated to provide "legitimized coverage to hide any wrongful discriminatory action taken against [him]." (Docket Entry No. 31, Ex. 1, Declaration of Osama Ibrahim).  Ibrahim points out that Arafat's signature is not on the letter.  Ibrahim also notes that the City's policy is that the Human Resources Department reviews all termination recommendation letters before they are forwarded to Williams.  In his affidavit, Williams stated that "[t]his practice insures that the recommending authority has enough facts and/or evidence to substantiate a recommendation for termination." (Docket Entry No. 30, Ex. 19, Affidavit of Stephen Williams).   According to Williams, he received the termination recommendation letter "[s]ometime in May 2006," when it was forwarded to him by Human Resources.  (*Id.*).  Ibrahim asserts that there is nothing on the face of the letter to indicate that it ever passed through the Human Resources Department – there are no signatures of any HR staff on the letter, no reference numbers, nor any receiving or forwarding dates.  (*Id.*).  Ibrahim argues that Arafat did not write this letter, pointing out the inconsistency between the negative comments about his performance in an April 26 letter and the positive comments made in their May 31, 2006 conversation.  In that conversation, Arafat told Ibrahim that someone of his caliber could work

19

anywhere he wanted and that top institutions like the CDC would be looking to steal him away. (*Id.*).

On May 31, 2006, Debo, another Epidemiologist Manager, wrote Williams to complain about Ibrahim's "constant abuse and demeaning comments." (Docket Entry No. 30, Ex. 14). Debo felt "frustration because in all the ways I have tried my best to function efficiently, I have been hampered on many occasions by Dr. Ibrahim." (*Id.*). He pointed to two instances. First, Ibrahim had challenged Debo's involvement with a "Health Disparity and Needs Assessment" project that Williams had invited Debo to work on. Second, Ibrahim had complained that Debo allowed another health official, without his permission, to brief the epidemiologists about the work to be done relating to possible rabies exposure at a daycare facility. Debo explained that there were other instances of "intimidation and abuse" by Ibrahim. He stated that he was "stressed out and this is affecting my ability to do my job and the only option left for me is to look for another job." (*Id.*). Debo asked Williams to help get a "quick and favorable adjudication of this issue." (*Id.*).

Also on May 31, 2006, Ibrahim recorded another conversation with Arafat. According to Ibrahim, Arafat informed him that approximately three months earlier, Williams had stated that he wanted Ibrahim fired because he is Muslim and Middle Eastern. In Ibrahim's transcript of the May 31 conversation, Arafat stated that "it was decided that you must leave three months back." (Docket Entry No. 31, Ex. 1B). Arafat told Ibrahim, "I have been, for three months . . . defending you in resisting your termination decision" and have "been for three or four months in hell because I did not want to terminate you." (*Id.*). Ibrahim asked, "[O]n which basis; on failure? There is no failure." (*Id.*). Arafat responded, "I know it is just he is not a good fit." (*Id.*). Ibrahim said, "this is discrimination." The following exchange appears in Ibrahim's transcript of the conversation:

| | |
|---|---|
| Arafat: | [N]o it is very easy, you know just some complaints; this is what he not doing this he is what he is doing; this is all it takes. |
| Ibrahim: | [T]his would be all on purpose and you know that. |
| Arafat: | [O]n purpose or not this is what it takes, what are you going to say, and Osama, it is not one or two it is a network. |

(*Id.*).  Arafat explained to Ibrahim that "not only those who work near to you, but also those who are around you, these people – I know – they do not [want] you to be good, they do not want you to succeed, and they do not want to see you in this place from the beginning, they do not want to see me too."  (*Id.*).  Ibrahim responded, "this is humiliation and God do not allow us to accept humiliation."  The conversation continued:

| | |
|---|---|
| Arafat: | [Y]ou are right, but it is not like that, no body is talking and saying you are a Muslim, you are Arab, no one will talk like this. |
| Ibrahim: | [B]ut this is the prime basis. |
| Arafat: | [V]ery good, but how do you think, how did you know that they do not like Raouf, how have you interred [sic] inside of them and see, I will say he doesn't like me as I am Arab and Muslim. The same moment, you rise up this issue, any one of them can take you to the court and will tell; you have said this about me prove it and if you cannot prove it you will go to jail.  Osama, the people here, no one had come to me and say directly you have to fire him because he is Arab and Muslim and it is unacceptable here.  [N]o it happened one time, oh my God no, no, no, to be exact happened two times and it was when you early came on board. |
| Ibrahim: | [B]ut this is the hidden cause. |
| Arafat: | [A]nd this is the problem, how to prove it is the hidden cause? How, how to prove it, all the talk is not a good fit, it is time for him to go why don't you take the decision, it is time for him to go, it is time for him to go. Osama, I swear to the Mighty God three times – they do not, even, deserve that I talk with them.  I did all the homework; I talked about you more than sufficiently.  Osama, because you should know and for the tenth time that I tell you; no one can come to me and say bad things about you.  It was only the one time, was when I |

met with your staff.

(*Id.*).  Arafat also said, "I was supposed to obey the orders and when they tell me this is finished, it

is finished.  I know for one hundred percent that I, myself, will be their next step, which is ok for

me."  (*Id.*).  Ibrahim asked Arafat why he recruited him to work at HDHHS if he knew there was

"this kind of racism" and that it would be "impossible that two like us could work here in these two

positions."  (*Id.*).  Arafat responded that he did not know about the racism, that he wished he knew,

and that it was his fault.  (*Id.*).  He continued, "Osama, they will never say we are racist or reveal

any racism [,] all what they will say; he is not the right fit."  (*Id.*).  Arafat explained that Texas is an

at-will employment state and that "they can just come to you at any time and tell you; you take your

belongings and go now."  (*Id.*).

Arafat asked Ibrahim to resign instead of being fired because it would be better for his career.

He told Ibrahim that there were "a lot of other jobs . . . a lot of them, much better than here.  They

will wish that someone like you work for them, and they are, even, here in Houston."  (*Id.*).  Arafat

said "Osama, you have to leave this place" because "the decision had, already, been taken" and

"when this decision will arrives [sic]; I will not be able to do anything for you."  (*Id.*).  Arafat

continued:

> [H]e will take the decision, the decision had been taken and it is only
> a matter of time.  What is better?  If give Osama a letter, because I
> am the one who should give it to you, whether you will think that it
> is Raouf or not, I am the one who should deliver it to you.  But when
> I will receive that letter and I have to tell know [sic] you have to go
> out, or it may indicate that you have a month the go.  Which is better
> for you?  I think it is better that you come by yourself and say this is
> my resignation, which is effective after a month, during which you
> will have another job and every one will say that he resigned because
> he found a better job.

(*Id.*).  Ibrahim resisted the idea of resigning and expressed his intent to take legal action against the

HDHHS because of the discrimination.  Arafat responded, "Osama, could you prove any thing against Stephen[?]."  (*Id.*).  Ibrahim said he could prove "all the events."  (*Id.*).  Arafat warned that "any thing you do in your job will be in your record, if you will leave here in a dramatically way and filed a charge against him.  This will be retained in your record forever."  (*Id.*).  Arafat hoped that Ibrahim would "go in a respectful way," and asked him not "to stay till [sic] you will get fired."  (*Id.*).  Ibrahim told Arafat he would think about it and the conversation ended.

In Midway's transcript of the May 31 conversation between Arafat and Ibrahim, Arafat said: "For three months I have been resisting a decision, I swear to the Magnificent God three months and I am on fire."  (Docket Entry No. 32, Ex. 23).  He stated "Osama, there is an issue my dear, the Muslim [. . .] you, I cannot help you [. . .] I cannot help you with this issue, I cannot help you make a decision [. . .] I swear to God I cannot help you [. . .] I swear to God.  I swear to the Magnificent God [. . .] Nothing like that happened to me in my life."  (*Id.*).  Arafat continued, "Osama there are too many people, I wished that would work, and in Houston they are a thousand times better than them, call this place war, call it justice, whatever [. . .] I don't know.  Four months in the past, I could not make a decision, and I cannot make a decision.  And the answer should not be that way."  (*Id.*).  Arafat told Ibrahim, "There are better places than the situation that you are in now, which [. . .]."  (*Id.*).  The conversation continued, as follows:

> Ibrahim:    This is not an issue of money, it is an issue of discrimination, complaints, and they do not do anything with it. [. . . . . . . . .]
>
> Arafat:    Osama, what is after that, not one only but a net.
>
> Ibrahim:    It is a company, it is a gang.  It is a net, it is a gang.  Because we are two people in one place.
>
> Arafat:    You have the right.  I should be sure, and I know from my past experience that this problem was not true, I pity you, I should, your

life, your work, it is a shame, I never lied in my life, you will take us all with you, I swear to God, it is not fair for you to lose your job and your work.

Ibrahim:      Raouf, you know I am losing.  I am losing thirty-five thousand Dollars.

Arafat:       You are talking about Tina, Verna, one hundred individuals, they all are like poison, even all the people around you, they do not want to see you, they do not want to see you.

Ibrahim:      It is mean [. . .].  This is my scoundrel [. . . . . . . . .].  Raouf, this is clear, we are not supposed to withdraw now.

Arafat:       Osama, I am going to make this decision.  Which is better, if I told you that you have one month and this is your resignation, you have one month, or if you say this is my resignation, then you go and find a job, so it does not registered in your records [. . . . . .] Osama, this will take time everything, slowly, slowly.

Ibrahim:      Raouf, you are talking about a subject like, I do not know, how do you let someone control this situation in this kind of way without justice, without justice?

Arafat:       Osama, this [. . .] is the employment law in the State of Texas.

. . . .

Arafat:       Osama, I am thinking that I am leaving from here, and I am loaded with worries.  This is not because of anything, but because what happened is wrong, wrong, they are supposed to tell me [. . .] if it happened to me, what will happen?

Ibrahim:      How could we allow that, how could we allow that?

Arafat:       Maybe the circumstances [. . .].  There is something called self respect, if the future, gone.

Ibrahim:      Raouf, at this picture.  I am not going to talk now about this, I am not going to talk about this.  The future.

Arafat:       Anything you do during your employment is dramatic [. . .] if you sue, everything will be in your records, [. . .] and then they will ask for reports about you.  We do not know what will happen tomorrow

24

and what will cause a problem.  I swear to God for my dignity, it is better to resign and leave, I swear to God, I did not do anything to you, this conversation is not [. . .].

. . . .

Ibrahim:        Raouf, just give me a chance to think.

Arafat:         I just wanted to tell you that I am on fire, on fire, I swear to God I am in fire. Then, then.

(*Id.*).

On June 2, 2006, two days after Ibrahim's conversation with Arafat, Williams terminated Ibrahim's employment, effective June 16, 2006.  (Docket Entry No. 30, Ex. 8).  In his affidavit, Williams stated that "given [his] limited contact with Dr. Ibrahim, [he] relied heavily on [his] Assistant Director's recommendation."  (*Id.*, Ex. 19, Affidavit of Stephen Williams).  According to Williams, he reviewed Ibrahim's April 24, 2006 evaluation, saw that his performance rating was below standard and in need of improvement, and decided to go "along with the recommendation for termination" because "Ibrahim was not meeting the needs of the Bureau to the satisfaction of his Assistant Director."  (*Id.*).  Williams sent Ibrahim a termination letter stating that his job would end effective June 16, 2006.  (Docket Entry No. 30, Ex. 8).  In the letter, Williams gave Ibrahim the option to resign before that date "because Dr. Ibrahim was executive level and a professional" and Williams "wanted to give him the opportunity to resign rather than have a termination on his professional record."  (*Id.*).

In his affidavit, Ibrahim stated that he did not learn about his job termination until June 3, 2006.  (Docket Entry No. 31, Ex. 1, Declaration of Osama Ibrahim).  On Friday June 2, he had received permission from Arafat to go home early to take care of his son, who was feeling ill.  (*Id.*).  Ibrahim attempted to check his work e-mail from home that evening, but his username and password

were not accepted.  (*Id.*).  He called Dr. Arafat and was told that "it might be the server is down."

(*Id.*).  Ibrahim was still unable to log in the next day.  After learning that his staff members did not

have any problems with their e-mail accounts, Ibrahim called Arafat to ask if he had been

terminated.  (*Id.*).  According to Ibrahim, Arafat told him, "yes you have been terminated, but I

swear it was not from me."  (*Id.*).

On June 15, 2006, Ibrahim responded to Williams by letter and tendered his resignation.

(Docket Entry No. 30, Ex. 9).  Ibrahim stated that he felt he had no other choice but to resign

because he wanted to save his "reputation of a stellar career performance of working with the City

of Houston and of twenty seven years working allover [sic] the world."  (*Id.*).

Ibrahim timely filed a complaint with the Equal Employment Opportunity Commission

(EEOC) and received a Notice of Right to Sue on September 26, 2007.  (Docket Entry No. 13, Ex.

A).  He filed this suit against the City and Williams on December 14, 2007.  (Docket Entry No. 1).

 Ibrahim received a Notice of Right to Sue from the Department of Justice on March 7, 2008.

(Docket Entry No. 14, Ex. A).

In this suit, Ibrahim asserts national origin, religious, and race discrimination claims under

Title VII against the City and under 42 U.S.C. § 1983 against the City and Williams,  (Docket Entry

No. 1 at 8–11, 12–13), and alleges race discrimination under 42 U.S.C. § 1981 against the City, (*id.*

at 10–11).  Ibrahim has withdrawn his § 1981 claim against Williams.  (Docket Entry No. 13).

Ibrahim seeks actual and punitive damages, (Docket Entry No. 1 at 15), conceding that punitive

damages are available only under § 1983 against Williams in his individual capacity, (Docket Entry

No. 13 at 11).

The defendants' motion for summary judgment followed discovery.

## II.   The Legal Standards

### A.   Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(c).   "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."   *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."   *See Celotex*, 477 U.S. at 325.   While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.   *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).   "'An issue is material if its resolution could affect the outcome of the action.'"   *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).   "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."   *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.   "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence

supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    Discrimination Claims under Title VII, § 1981, and § 1983

Title VII prohibits discrimination by employers "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a). Intentional discrimination can be proven by either direct or circumstantial evidence. *Burrell v. Dr. Pepper/Seven Up Bottling Group*, *Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). Evidence is "direct" if it would prove the fact in question without inference or presumption. *Jones v. Robinson Property Group*, *L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citations omitted). If no direct evidence exists, the court uses the familiar burden-shifting framework created by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, a plaintiff alleging discrimination must first make a *prima facie* showing that: (1) she is a member of a

protected class; (2) she was qualified for the position; and (3) others similarly situated were treated more favorably. *See id.*; *Strong v. Univ. Healthcare System*, *L.L.C.*, 482 F.3d 802, 805–06 (5th Cir. 2007). If the plaintiff makes the *prima facie* showing, the burden shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the defendant meets this burden, the plaintiff must then create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision. *See Burrell*, 482 F.3d at 411–12 (citations omitted). The plaintiff can meet this burden "by producing circumstantial evidence sufficient to create a fact issue as to whether the employer's nondiscriminatory reasons are merely pretext for discrimination." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005). The United States Supreme Court, in *Reeves v. Sanderson Plumbing Prods.,* stated that "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." 530 U.S. 133, 143 (2000). A plaintiff may show pretext by demonstrating that the proffered reasons for the challenged employment action are false or "unworthy of credence." *Nasti v. CIBA Speciality Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir. 2007) (citations omitted). If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the *prima facie* case, will usually be sufficient to survive summary judgment. *Reeves*, 530 U.S. at 146-48.

In a mixed-motive case, if the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have

29

been made regardless of discriminatory animus.  *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004).  The plaintiff has the ultimate burden of showing a genuine issue of material fact on whether the defendant discriminated on the basis of the plaintiff's membership in the protected class. *Reeves*, 530 U.S. at 143.

Discrimination claims under Title VII, § 1981, and § 1983 are "parallel causes of action." *Lauderdale v. Tex. Dep't of Crim. Justice, Inst'l Div*., 512 F.3d 157, 166 (5th Cir. 2007). "Accordingly, the 'inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and Title VII.'"  *Id.* (quoting *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)).

## III.    Analysis

The defendants argue that they are entitled to judgment as a matter of law because the undisputed evidence in the record shows that Ibrahim was fired for substandard performance and not because of his race, religion, or national origin.  They argue that Ibrahim's evidence of discrimination is inadmissible hearsay and that, even if it is admissible, they are not liable because the evidence shows that they would have made the same decision regardless of discriminatory animus.  (*Id.*).  The defendants argue in the alternative that even assuming Ibrahim has established a *prima facie* case of discrimination, they have proffered a legitimate nondiscriminatory reason for the termination  – his poor performance – and Ibrahim has failed to raise a fact issue as to whether that reason is pretextual.  Ibrahim responds that he has presented competent summary judgment evidence of discrimination that raises fact issues as to whether his race, religion, and national origin were motivating factors in the decision to terminate his employment.  Ibrahim argues that he has offered  direct  evidence  of  discrimination,  but  that  if  this  court  concludes  otherwise,  the

30

circumstantial evidence in the record is sufficient to preclude summary judgment.  Ibrahim argues

that a plaintiff's failure to rebut the "same decision" defense does not absolve the defendant of

liability, but only limits the plaintiff's available remedies.

### A.    The Admissibility of the Hearsay Statement Offered as Evidence of Discriminatory Motive

The defendants do not dispute that "Arafat's alleged statements informing Ibrahim of

comments made [by] Williams . . . are on their face discriminatory towards Dr. Ibrahim."  (Docket

Entry No. 30, at 8).  The defendants challenge Ibrahim's affidavit testimony relating what Arafat

told him about what Williams had said to Arafat.  Two levels of hearsay are present: (1) Williams's

statements to Arafat about Ibrahim and about Muslims and Middle Easterners; and (2) Arafat's

statements to Ibrahim relating Williams's statements.  (*Id.*).  The defendants argue that Ibrahim has

failed to identify an exception or exclusion from the hearsay rule for both levels.  The defendants

also challenge Ibrahim's testimony about what Arafat told him on the basis that Ibrahim lacks

personal knowledge of Williams's statements to Arafat.  (*Id.*, at 8–9).  The defendants argue that this

double hearsay is Ibrahim's only evidence of discrimination and that because it is inadmissible,

summary judgment is appropriate.

Ibrahim responds that both statements are admissions by a party opponent and excluded from

the hearsay rule.  Ibrahim asserts that Williams and Arafat are agents of the City of Houston and that

these statements concerned matters within the scope of their authority as Director and Assistant

Director of HDHHS.  (Docket Entry No. 31, at 7–8).  Ibrahim also asserts that the summary

judgment evidence includes other discriminatory statements by Williams.  Ibrahim cites Williams's

comment to Arafat that Islam is a bunch of "hocus pocus"; Williams's instruction to Arafat that he

should not hire a job candidate whose name indicated that he was Muslim; and Williams's comment

to Arafat that people would think Arafat hired Ibrahim because Ibrahim was also a Muslim.  (*Id.*).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED. R. EVID. 801(c).  As a general rule, "[h]earsay is not admissible except as provided by these rules."  FED. R. EVID. 802. Federal Rule of Evidence 801 provides in pertinent part:

> A statement is not hearsay . . . if the statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity, or . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

FED. R. EVID. 801(d)(2).  Under the federal rules, "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."  FED. R. EVID. 805; *see United States v. Pendas-Martinez*, 845 F.2d 938, 942–43 (11th Cir. 1988) (both levels of hearsay must be excepted from the hearsay rule).

A statement by a supervisory official who plays a role in the decisionmaking process is generally admissible in an employment discrimination case under Rule 801(d)(2).  *See, e.g.*, *Miles v. M.N.C. Corp.*, 750 F.2d 867, 873–75 (11th Cir. 1985).  If Arafat testified, his statement about what Williams had said to him about Ibrahim would be admissible under Rule 801(d)(2)(D); Williams is a supervisor and his statements were about a matter within the scope of his agency. Ibrahim's testimony relating what Arafat told him about what Williams said must be separately analyzed.

Courts generally hold that a plaintiff employee's testimony about a coworker's statement relating an alleged statement of a supervisor with decisionmaking authority does not concern a matter within the scope of the coworker's employment when the declarant is neither the plaintiff's

supervisor nor has a significant role in the employment decision at issue.  In *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1456–57 (11th Cir. 1997), the court held that the plaintiff's testimony that his coworkers told him that his supervisor had made age-biased statements to them was inadmissible hearsay.  The hearsay problem was in the plaintiff's testimony about the coworker's statements, which were not made within the scope of the coworkers' authority at the company.  In *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927–28 (6th Cir. 1999), the court held that a coworker's statements were not within his scope of employment when the coworker-declarant was not the plaintiff's supervisor during the relevant period and was not involved "in any of the critical appraisals of her performance that preceded her leaving work." This approach dovetails with the principle that statements regarding employment matters are within the scope of employment if the declarant was "an advisor or other significant participant in the decision-making process that is the subject matter of the statement."  *Breneman v. Kennecott Corp.*, 799 F.2d 470, 473 (9th Cir. 1986) (holding that statements were not within the scope of employment when the declarants relating what a decisionmaker to them said were not involved in the company's discharge of the plaintiff);  *see also Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (testimony by the plaintiff that other firefighters told her of statements by a supervisor was inadmissible to prove that the supervisor actually made the statements).

The cases show that statements to a plaintiff by the plaintiff's immediate supervisor, relating what a supervisor with greater authority said about relevant employment decisions relating to the plaintiff, are within the scope of the immediate supervisor's employment.  *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 610–11 (8th Cir. 1997); *see also Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1238 n.1 (2d Cir. 1995) (statements of intermediate supervisors relating the statement of a superior

33

with decisionmaking authority were within the scope of employment when one of the intermediate supervisors had been instructed to fire the plaintiff and the other was plaintiff's immediate supervisor who reported to the superior on the plaintiff's performance and status); *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992) (statement by a supervisor who "had ostensible authority over and took part in personnel decisions regarding hiring and firing of sales staff" was within the scope of employment and was admissible when testified to by a nonplaintiff employee who heard the statement first hand).  Under these cases, Ibrahim's statement in his affidavit relating what Arafat told him about what Williams said to Arafat is not hearsay.  Ibrahim's testimony about Arafat's statements to him relating what Williams allegedly said to Arafat were made within the scope of Arafat's role as Assistant Director and Ibrahim's direct supervisor.  Arafat was relating to Ibrahim what Williams had said about Muslims in the context of hiring and firing HDHHS employees, including Ibrahim.  Ibrahim has personal knowledge of what Arafat said.  These statements are admissible as admissions by a party opponent.

### B.    Direct Evidence of Discrimination

Ibrahim argues that his affidavit testimony describing Arafat's statement to him relating Williams's statement to Arafat about Ibrahim and Muslims is direct evidence of discrimination.  The defendants concede that Ibrahim's affidavit testimony about Williams's statements is direct evidence of discriminatory animus.  (Docket Entry No. 30, at 8).  "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption."  *Sandstad v. CB Richard Ellis*, *Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

If the statements are direct evidence, then summary judgment must be denied.  But it is unclear that the statements are direct evidence of discrimination.  "[W]hen a person or persons with

34

decision making authority evinces racial animus that may constitute direct evidence of discrimination." *Jones v. Robinson Prop. Group*, *L.P.*, 427 F.3d 987, 993 (5th Cir. 2005). "[S]tatements or documents which show on its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis – for the adverse employment action are direct evidence of discrimination." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003). Whether a workplace comment is direct evidence of discrimination may turn on whether the comment related to the protected class of persons of which the plaintiff is a member, was proximate in time to the termination, made by an individual with authority over the employment decision at issue, and related to the employment decision at issue. *See Gillaspy v. Dallas Independent School Dist.*, 278 Fed. App'x 307, 313 (5th Cir. 2008); *Jenkins v. Methodist Hospitals of Dallas*, *Inc.*, 478 F.3d 255 (5th Cir. 2007); *Brown v. CSC Logic*, *Inc.*, 82 F.3d 651 (5th Cir. 1996).

In *Jones*, the court found racially biased comments to be direct evidence of race discrimination. 427 F.3d at 993. In that case, an African-American applicant was not hired for the position of casino poker dealer. Several witnesses testified that the decisionmakers for the casino's poker room were "using race as a factor in employment decisions." *Id*. The decisionmakers made comments to these witnesses that "these good old white boys don't want black people touching their cards," and "maybe I've been told not to hire too many blacks in the poker room." *Id*. at 990-91. Because these race-based comments related directly to the decision whether to hire African-Americans, the court concluded that the comments were direct evidence of the plaintiff's claim. *Id.*; *see also Haun v. Ideal Industries*, *Inc.*, 81 F.3d 541, 546 (5th Cir. 1996) (statement that company's president did not want to hire older workers constituted direct evidence of age discrimination); *Portis v. First National Bank*, 34 F.3d 325, 329 (5th Cir. 1994) (statement by supervisor that a

35

female subordinate "would never be worth as much as a man to the bank" was direct evidence of discrimination); *Lopez v. River Oaks Imaging & Diagnostic Group*, Inc., 542 F.Supp.2d 653, 662 (S.D. Tex. 2008) (employer's statement that the job offer to the applicant, who was transgendered, was being revoked because applicant had "represented herself as a female" but was "later learned to be a male" was direct evidence of discrimination); *Cross v. FPP Operating Partners*, 2001 WL 1143159, at *7 (N.D. Tex. Sep. 25, 2001) (supervisor's comment allegedly made to white subordinate employees that "no fucking niggers were going to work in her store, especially niggers from Electra" was direct evidence of discrimination); *Bowe v. Exide Corp.*, 2001 WL 705881, at *3 n. 1 (N.D. Tex. June 18, 2001) ("[Direct] evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor.").

By contrast, in *Jones v. Overnite Transp. Co.*, 212 Fed. App'x 268, 273 (5th Cir. 2006), the court held that racially biased comments were not direct evidence of discrimination.  The plaintiff, a dock worker at a transportation company, allegedly overheard a supervisor state that he wanted to "get rid of all the blacks" and "fire a bunch of niggers."  *Id.*  The plaintiff's employment was terminated a few months after these comments.  *Id.*  The court held that although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination."  *Id.*  The court also considered evidence that the same supervisor had requested a staffing agency to send white drivers instead of black drivers.  *Id.*  The court held that this statement was not direct evidence of discrimination because it did not relate to the plaintiff's former employment as a dock worker and required the trier of fact to infer a nexus between the statement and plaintiff's termination.  *Id.*; s*ee also Haas v.*

36

*ADVO Sys.*, *Inc.*, 168 F.3d 732, 733 (5th Cir. 1999) (holding that a job interviewer's statement that the plaintiff's age caused him "concern" was not direct evidence of age discrimination in the employer's decision not to hire plaintiff because an additional inference of discrimination was required); *Harris v. Park Cities Volkswagen*, 3:03-CV-0328-BD, 2004 WL 76382, at *3 (N.D.Tex. Jan.13, 2004) (a statement to an African-American applicant that "you look like you will intimidate my managers" and a statement to another African-American applicant that he was not "the type of person the company was looking to hire" were not direct evidence of discrimination).

Applying these precedents to the present case leads to the conclusion that the statements Ibrahim presents should not be viewed as direct evidence of discrimination.  Based on the record evidence, it is reasonable to infer that Williams, the only individual superior to Arafat at HDHHS and the final decisionmaker for hiring and firing decisions, was the one who told Arafat "you have to fire him because he is Arab and Muslim."  Arafat explained to Ibrahim that Williams had made the decision to fire Ibrahim sometime in January or February 2006, that Arafat had been "ordered" to carry it out, and that there was nothing Arafat could do for Ibrahim.  Arafat said that Williams "will take the decision, the decision had been taken and it is only a matter of time. . . . whether you will think that it is Raouf or not, I am the one who should deliver it to you."  (Docket Entry No. 31, Ex. 1B).  But the record does not contain a statement by Arafat that Williams told Arafat to fire Ibrahim because he was Muslim and Middle Eastern.  An inference is required to reach this conclusion.  The record could also support an inference that one of Ibrahim's coworkers or subordinates made this statement.  Arafat related this statement in the middle of a discussion about several people at HDHHS who did not want to see Ibrahim succeed and who had complained about his performance.  Because an inference is required to conclude that Williams made this statement

37

showing that his decision to fire Ibrahim was based on improper criteria, it is not direct evidence of discrimination.

Arafat's description of Williams's racist attitudes and Arafat's statements to Ibrahim about other job applicants are not direct evidence of discrimination.  According to Ibrahim's transcript of his conversation with Arafat, Williams told Arafat that he should not hire a job candidate whose last name indicated he was Muslim, that Islam is a bunch of "hocus pocus," and that people would think Arafat hired Ibrahim because he was Muslim.  Arafat also described Williams as "racist" and said that he "hates Muslims."  These statements lack the requisite "indicia of specificity and causation" to be direct evidence of discrimination.  Although these statements evidence discriminatory animus, an inference is required to supply the causal link between these statements and the decision to terminate Ibrahim's employment.  Moreover, Williams's statements about another job candidate and a Muslim bringing a Muslim were made soon after Ibrahim was hired and are thus not sufficiently proximate to the termination to constitute direct evidence.  *See*, *e.g.*, *Pruitt v. Dallas Independent School Dist.*, No. 3-04-CV-0554-D, 2006 WL 1359909 at *5 (N.D. Tex. May 16, 2006) (comments made more than one year before adverse employment action were not sufficiently proximate in time to constitute direct evidence of discrimination); *Akop v. Goody Goody Liquor, Inc.*, No. 3-04-CV-2058-D, 2006 WL 119146 at *3 (N.D.Tex. Jan. 17, 2006) (comment not sufficiently proximate when made eight months before the adverse employment action).  Ibrahim has offered circumstantial, not direct, evidence of discrimination.  But, as analyzed below, whether the evidence is viewed as direct or circumstantial, it raises fact issues that preclude granting the defendants' summary judgment motion.

    **C.**    **Circumstantial Evidence of Discrimination**

The defendants do not dispute that Ibrahim has established a *prima facie* case of discrimination based on race, religion, or national origin. Ibrahim does not dispute that the defendants have proffered a legitimate nondiscriminatory reason for that decision. The defendants' stated reason for terminating Ibrahim's employment is his low performance evaluation, including his lack of productivity and inability to communicate and work well with staff. Ibrahim's April 2006 evaluation rated his performance as substandard and classified him as an employee who "needs improvement." Ibrahim did not complete the NEDSS or PHIN projects to Arafat's satisfaction. Ibrahim's subordinates in his Bureau complained to Arafat and Williams about his inability to communicate with them and to lead the Bureau of Epidemiology effectively. The defendants have met their burden of presenting a legitimate nondiscriminatory reason for the termination.

Ibrahim argues that summary judgment is inappropriate because the evidence in the record raises a fact issue as to whether the proffered reason is a pretext for discrimination or whether the reason, while true, is only one of the reasons for his termination and that his race, religion, or national origin was a motivating factor behind the decision. Ibrahim asserts that the performance evaluation is a pretext for discrimination because although Arafat testified that he met with Bureau Chiefs once every two weeks to discuss their performance, Ibrahim was unaware of any performance problems until he was fired. Ibrahim also asserts that he never saw the performance evaluation until after he filed this lawsuit. Ibrahim also asserts that his conversations with Arafat, including the conversations revealing Williams's discriminatory animus, raise a fact issue as to whether his race, religion, and national origin were a motivating factor in the termination decision.

The third prong of the *McDonnell Douglas* test was altered in *Desert Palace*, *Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (holding that the mixed-motive theory of

discrimination is available in cases with circumstantial evidence of discrimination).  Under the modified *McDonnell Douglas* approach in the Fifth Circuit, the plaintiff must create a genuine issue of material fact that: (1) the defendant's reason is not true, but is instead a pretext for discrimination; or (2) the defendant's reason, while true, is only one of the reasons for its conduct and that discrimination was a motivating factor in the defendant's decision.  *Rachid v. Jack in the Box*, *Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  The court in *Rachid* did not separate its discussion of the plaintiff's evidence into categories of pretext and motivating factor but instead considered all the evidence as a whole.  *See id.* at 313-316.  This approach is consistent with Supreme Court precedent that the key in a Title VII case is whether the employee's protected status "actually motivated" the employer's decision.  *Reeves v. Sanderson Plumbing Prods.*, *Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In analyzing the impact on the summary judgment analysis of the evidence of statements by Williams and Arafat, it is unclear whether the *CSC Logic* factors of the statements' relevance to the plaintiff's protected class, the closeness in time to the job termination, and the position of the person making the statement, only apply when statements are offered as evidence of direct discrimination as opposed to circumstantial evidence.  *Compare Jenkins v. Methodist Hospitals of Dallas, Inc.,* 478 F.3d 255 (5th Cir. 2007) (applying four-factor test to evidence of pretext in evaluating a section 1981 claim); *with McLaughlin v. W & T Offshore, Inc*., 78 Fed. Appx. 334, 338-39 (5th Cir. 2003) ("In order to prove pretext in this manner, the statement must: (1) demonstrate a discriminatory motivation, and (2) be made by a person 'primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decision maker.'"); *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("We continue to apply the *CSC Logic* test when a remark is

presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework . . . . [T]he *Russell* court did not apply the *CSC Logic* test to a remark introduced as additional evidence of discrimination."); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (holding that workplace remarks sufficed as circumstantial evidence from which inference of discriminatory intent could be drawn even though comments were "stray remarks" under the *CSC Logic* test). "When two panel opinions appear in conflict, it is the earlier which controls," *Harvey v. Blake*, 913 F.2d 226, 228 n. 2 (5th Cir.1990), as "one panel of [the Fifth Circuit] cannot overrule the decision of another panel," *United States v. Darrington*, 351 F.3d 632, 634 (5th Cir. 2003).  The decisions in *Russell* and *Laxton* were issued before *Jenkins* and appear to provide the test for workplace comments as circumstantial evidence of discrimination.

Under the more relaxed test used in *Russell* and *Laxton*, a plaintiff wishing to use workplace remarks as circumstantial evidence of employment discrimination need only show that the remarks demonstrate discriminatory animus on the part of a person who is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker.  *Russell*, 235 F.3d at 225*; Laxton*, 333 F.3d at 583; *Sandstad*, 309 F.3d at 899; *see also Phillips v. TXU Corp.*, 194 Fed. App'x 221, 228 (5th Cir. 2006) (holding that "[a] remark is considered probative of discrimination if it demonstrates discriminatory animus and was made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decisionmaker.").

The evidence in the record concerning Williams's alleged statements is at least circumstantial evidence of discriminatory animus.  Williams was the relevant decisionmaker and the content of these statements indicates racial or religious animus.  Although the record contains

evidence that Ibrahim was the subject of complaints by employees working under his supervision and the unfavorable evaluation, the record also contains competent evidence of statements by Williams evidencing discriminatory animus against Muslims and Middle Easterners.  The record also contains disputed evidence as to Ibrahim's performance.  The record evidence raises disputed fact issues material to determining whether race or religion was a motivating factor for Ibrahim's termination.     The defendants argue that, despite the evidence of discriminatory animus, the "same actor" inference of nondiscrimination, set forth in *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir. 1996), mandates summary judgment in their favor.  In *CSC Logic*, the Fifth Circuit adopted the Fourth Circuit's decision in *Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir. 1991), that when the same supervisory employee hires and fires a plaintiff within a short period of time, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."  *Id.*  The *Proud* court explained that "claims that employer animus exists in termination but not in hiring seem irrational" and that "it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job."  *Id.*  The defendants contend that the inference applies here because Ibrahim was hired and fired by Arafat and Williams, who had the same roles in both decisions, within a roughly one-year period.  Ibrahim argues that the evidence in the record shows that Arafat hired him and Williams fired him, or that the evidence at least raises a fact issue as to whether the same actor made the decision to hire and fire him.

The same-actor inference does "not rule out the possibility that an individual could prove a case of discrimination."  *Russell*, 235 F.3d at 229 n.16.  Although a court may infer an absence of discrimination if the same individual hired and fired the plaintiff, such an inference is not required. *Haun v. Ideal Indus.*, *Inc.*, 81 F.3d 541, 546 (5th Cir.1996) ("While evidence of [same actor]

42

circumstances is relevant in determining whether discrimination occurred, we decline to establish a rule that no inference of discrimination could arise under such circumstances."); *see also Wexler v. White's Fine Furniture*, *Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) ("Although the factfinder is permitted to draw this [same-actor] inference, it is by no means a mandatory one, and it may be weakened by other evidence."); *Waldron v. SL Indus.*, *Inc.*, 56 F.3d 491, 496 n. 6 (3d Cir.1995) (noting that the same-actor inference "is simply evidence like any other and should not be afforded presumptive value").  The court must "look at the evidence as a whole, keeping in mind the ultimate issue:  Whether [race] was a determinative factor in the employment decision."  *Haun*, 81 F.3d at 546–47; *cf. Bradley v. Harcourt*, *Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996) (finding that same-actor inference warranted grant of summary judgment because the plaintiff "produced no meaningful evidence indicating either that [the employer's] proffered explanation was false or that her supervisor harbored discriminatory animus towards her because she was a woman").

In the present case, the defendants maintain that Williams knew Ibrahim was one of Arafat's "countrymen" before he was hired.  They emphasize that Arafat has the same protected characteristics as Ibrahim.  The evidence shows that Arafat and Williams played the same role in hiring and firing Ibrahim, which occurred within roughly one year.  Arafat reviewed the grounds for the decision, made a recommendation to Williams, and Williams relied on that recommendation to make a final decision.  Yet Ibrahim has provided evidence that Williams made multiple derogatory comments concerning Ibrahim's race and religion and refused to consider hiring someone because of his Muslim-sounding name.  Arafat told Ibrahim that Williams was "racist" and "hates Muslims."  Arafat explained to Ibrahim that Williams had made the decision to terminate his employment and had ordered Arafat to carry that decision out, and that Williams had a racist attitude toward Muslims,

Islam, and people from the Middle East.  The record precludes applying the same-actor inference as the basis for summary judgment.

The defendants' motion for summary judgment is denied.

## IV.    Conclusion

Ibrahim established a *prima facie* case of discrimination.  The defendants have proffered a legitimate nondiscriminatory reason for Ibrahim's termination, but the evidence in the record raises fact issues material to determining whether the reason was pretextual and, even if true, was only one of the reasons for the job termination and Ibrahim's race, religion, or national origin was a motivating factor.  The defendants' motion for summary judgment is denied.  The parties will file a Joint Pretrial Order by **May 8, 2009.**  Docket Call is rescheduled for **May 15, 2009**, at 2:00 P.M. in Courtroom 11-B.

SIGNED on April 15, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge